**United States District Court**

For the Northern District of California

1
2
3
4
5
6
7
8        UNITED STATES DISTRICT COURT

9        NORTHERN DISTRICT OF CALIFORNIA

10

11   OURS TECHNOLOGY, INC.,                    No. C 09-00585 MHP
     a Taiwanese corporation,

12              Plaintiff,                      **MEMORANDUM & ORDER**

13        v.                                    **Re: Defendant's Motion to Dismiss or
                                                Alternatively to Transfer**
14   DATA DRIVE THRU, INC.,
     a Texas corporation,

15              Defendant.

16   _____/

17

18        Plaintiff Ours Technology, Inc. ("OTI"), brings this action against defendant Data Drive

19   Thru, Inc. ("DDT"), for a declaratory judgment of non-infringement, invalidity and unenforceability

     of defendant's patent.  Now before the court is defendant's motion to dismiss the complaint for lack
20
     of standing pursuant to Federal Rule of Civil Procedure 12(b)(1), or, in the alternate, to transfer the
21
     action to the Eastern District of Texas for consolidation with a previously-filed suit in which
22
     defendant has commenced an action against four other defendants.  Having considered the
23
     arguments and submissions of both parties, and for the reasons set forth below, the court rules as
24
     follows.
25

26   BACKGROUND

27

28

United States District Court

For the Northern District of California

1    OTI is a Taiwanese corporation that is not registered to do business in any state of the United

2  States.  See Cheng Dec., Docket No. 19, ¶ 2.  OTI has no offices in the United States, and no direct

3  sales into the United States.  Id.  OTI is a "fabless" semiconductor design company, which designs

4  and develops microchips and contracts with manufacturing companies (known as foundries) to have

5  its chips produced.  Id. ¶ 3.  The chips are then sold to Original Equipment Manufacturers ("OEMs")

6  that incorporate the chips into finished products.  Id.

7    The chip relevant to this action is OTI's 2108 chip, which consists of a microprocessor and

8  solid-state computer memory.  Id. ¶ 4.  The chip enables the automatic transfer of data files between

9  any two computers via a Universal Serial Bus ("USB") cable including a self-enabling, built-in

10  application program embedded in the data transfer cable itself.  Id. ¶ 4; see also Complaint, Docket

11  No. 1 ("Compl."), ¶ 3.  OTI either sells the 2108 chip to OEMs abroad or, in one instance, OTI

12  contracted with Targus, Inc. ("Targus"), to design and supply the completed data transfer cable

13  including the 2108 chip to Targus.  See Cheng Dec. ¶¶ 4-5.  Targus purchases the cables from OTI,

14  takes delivery of them in Hong Kong, and then distributes them under its own brand to OEM and

15  retail chains in the United States.  See Michelle Dec., Docket No. 17, ¶¶ 2-3.

16    OTI has filed both Taiwanese and U.S. patent applications covering its automatic file transfer

17  invention.  See DeBruine Dec., Docket No. 16, ¶ 2, Exh. A (copy of U.S. Patent Application

18  Publication, entitled "Application Method for Universal Serial Bus File Transfer Cable").  OTI's

19  U.S. patent application is still pending in the United States Patent & Trademark Office.  Id.

20    DDT is a Texas corporation with a principal place of business in Dallas, Texas that

21  manufactures and sells data transfer devices.  Compl. ¶¶ 4 & 6.  DDT applied for and received U.S.

22  Patent No. 7,108,191 ("the '191 patent"), entitled "Intelligent Computer Cabling" in September

23  2006.  Andrus Dec., Docket No. 30, ¶ 2.  The cable devices allow for the automatic transfer of data

24  between computers without having to install any software or drivers on either machine.  Id.

25    In December 2008, DDT brought suit in the Eastern District of Texas against defendants

26  ACCO Brands Corporation ("ACCO"), RadioShack Corporation ("RadioShack"), Samsung

27  Electronics America, Inc. ("Samsung"), and Targus, Inc. ("Targus"), for infringement of its '191

28

2

United States District Court

For the Northern District of California

1    patent (Case No. C:08-00485-TJW, filed December 31, 2008, hereinafter "Texas suit").  See Motion

2    to Dismiss, Docket No. Exh. A (copy of Complaint, hereinafter "Texas Compl."); Compl. ¶ 8;

3    Answer, Docket No. 9, ¶ 8.  ACCO is a Delaware corporation with its principal place of business in

4    Lincolnshire, Illinois.  See Texas Compl., ¶ 5.  RadioShack is a Delaware corporation with its

5    principal place of business in Ft. Worth, Texas.  Id. ¶ 2.  Samsung is a New York corporation with

6    its principal place of business in Ridgefield Park, New Jersey.  Id. ¶ 4.  Targus is a New York

7    corporation with its principal place of business in Anaheim, California.  Id. ¶ 3.

8        Each of the four named defendants is or has been a customer for OTI's products that

9    implement OTI's automatic file transfer technology.  See Compl. ¶ 9; Answer ¶ 9.  The Texas suit is

10   directed towards each of the four named defendant's cable devices that contain an automatic file

11   transfer feature.  Id.  These devices are variously identified in the Texas action as USB Transfer

12   Cable, High Speed File Share Cable, USB Data Cable and Media Sharing Cable.  OTI's 2108 chip is

13   included in all of these cables at issue in the DDT litigation, as a component of the allegedly

14   infringing products.  See Andrus Dec., Docket No. 30, ¶¶ 3-5.  DDT alleges that each of the named

15   defendants purchased the chips that enabled their data transfer products from OTI and incorporated

16   them into the final, infringing products.  Id.  DDT further alleges that the allegedly infringing end

17   products require additional components beyond OTI's 2108 chip, and that OTI's 2108 chip is also

18   used in products that are not accused of infringing the '191 patent.  Id. ¶¶  4 & 6.  DDT has not

19   alleged that OTI is an infringer of the '191 patent.

20       When OTI learned of the Texas suit, OTI agreed to indemnify the four named defendants.

21   See Cheng Dec. ¶¶ 6-7; Michelle Dec. ¶ 5; Brown Dec., Docket No. 18, ¶ 5; Dulsky Dec., Docket

22   No. 20, ¶ 5.  OTI then filed the instant action against DDT to challenge the validity of the '191

23   patent and obtain a judgment as to whether OTI infringes, directly, contributorily or by inducement,

24   any valid and enforceable claim of the '191 patent.  DDT now moves to dismiss this action pursuant

25   to Federal Rule of Civil Procedure 12(b)(1), on the basis that the court does not have jurisdiction

26   because there is no substantial controversy between DDT and OTI.  In the alternative, DDT requests

27   the action be transferred to the Eastern District of Texas, alleging it is a more convenient forum.

28
                                              3

1

2    LEGAL STANDARD

3    I.      Subject Matter Jurisdiction

4             A motion to dismiss under Federal Rule of Civil Procedure 12(b) (1) tests the subject matter

5    jurisdiction of the court.  See, e.g., Savage v. Glendale Union High Sch., 343 F.3d 1036, 1039-40

6    (9th Cir. 2003).  The plaintiff bears the burden of establishing the propriety of the court's

7    jurisdiction. Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994). Consequently, a

8    Rule 12(b)(1) motion will be granted if the complaint, when considered in its entirety, on its face

9    fails to allege facts sufficient to establish subject matter jurisdiction.  Savage, 343 F.3d at 1039 n.2;

10   Thornhill Publ'g Co. v. Gen. Tel. & Elecs. Corp., 594 F.2d 730, 733 (9th Cir. 1979).  Alternatively,

11   a defendant may seek dismissal under Rule 12(b)(1) by presenting evidence to refute the

12   jurisdictional facts alleged in the complaint.  Thornhill, 594 F.2d at 733.  Once the defendant has

13   introduced such evidence, the plaintiff "must furnish affidavits or other evidence necessary to satisfy

14   its burden of establishing subject matter jurisdiction."  Savage, 343 F.3d at 1039 n.2 (citation

15   omitted).

16   II.     Declaratory Judgment Act

17            The Declaratory Judgment Act ("DJ Act") provides: "In a case of actual controversy within

18   its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations

19   of any interested party seeking such declaration, whether or not further relief is or could be sought."

20   28 U.S.C. § 2201(a).  The Supreme Court has clarified that the "actual controversy" requirement of

21   the DJ Act refers to the type of cases and controversies that are justiciable under Article III of the

22   Constitution.  Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240–41 (1937); SanDisk Corp. v.

23   STMicroelectronics, Inc., 480 F.3d 1372, 1378 (Fed. Cir. 2007) (noting that federal jurisdiction

24   under the DJ Act extends only to matters that are Article III cases or controversies).  In other words,

25   because a court's jurisdiction extends only to cases or controversies under Article III, the record

26   must show an actual controversy between the parties.  Micron Tech., Inc. v. Mosaid Tech.'s, Inc.,

27   518 F.3d 897, 901 (Fed. Cir. 2008).  Whether an actual controversy exists under the DJ Act is a

28

United States District Court

For the Northern District of California

1    question of law for the court to decide.  Teva Pharms. USA, Inc. v. Novartis Pharms. Corp., 482

2    F.3d 1330, 1336 (Fed. Cir. 2007).

3           In determining whether a plaintiff's claim properly invokes the DJ Act, courts consider

4    "whether the facts alleged, under all of the circumstances, show that there is a substantial

5    controversy, between parties having adverse legal interests, of sufficient immediacy and reality to

6    warrant the issuance of a declaratory judgment." MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118,

7    127 (2007).  A declaratory judgment plaintiff must demonstrate, by a totality of the circumstances,

8    the presence of an actual or imminent injury caused by the defendant that can be redressed by

9    judicial relief.  Teva Pharms, 482 F.3d at 1338.  While the Supreme Court in MedImmune rejected

10   the "reasonable apprehension of suit" test as the standard for determining declaratory judgment

11   jurisdiction in patent disputes, a reasonable apprehension on the part of the declaratory judgment

12   plaintiff that it would face an infringement suit is nonetheless a factor to be considered in the more

13   general totality of or "all the circumstances" test to establish a justiciable controversy.  549 U.S. at

14   132, n.11.  In the context of a patent case, an actual controversy exists "where the patentee takes a

15   position that puts the declaratory judgment plaintiff in the position of either pursuing arguably

16   illegal behavior or abandoning that which he claims a right to do." SanDisk, 480 F.3d at 1381.

17

18   DISCUSSION

19          DDT argues that as a supplier of a component part of an infringing product, OTI does not

20   have standing to maintain its declaratory judgment action.  DDT argues that OTI has only an adverse

21   economic interest, as opposed to an adverse legal interest, against DDT for having alleged patent

22   infringement against OTI's customers that produce the end product.  DDT contends that the end

23   products require additional components beyond OTI's 2108 chip, and that OTI's 2108 chip is used

24   in other products that are not accused of infringing the '191 patent.  DDT argues that OTI should

25   have intervened in the Texas suit and this action should either be dismissed or transferred to Texas,

26   as the more convenient forum under In re TS Tech USA Corp., 551 F.3d 1315, 1319 (Fed. Cir.

27   2008).

28

United States District Court
For the Northern District of California

5

United States District Court

For the Northern District of California

1   OTI alleges that it has standing to bring this action because DDT has accused OTI's products

2   of infringement in the Texas suit.  OTI contends it is more than a supplier of component parts,

3   because in at least one case it sells the complete allegedly infringing product (the data transfer cable

4   apparatus) directly to one of the defendants, Targus.  In the other cases, OTI alleges it is indirectly

5   liable because DDT has accused the other defendants' data transfer cables of infringement "based on

6   OTI's microchip."  OTI concludes it cannot continue its particular business ventures without

7   subjecting it to the threat of patent infringement litigation by DDT.  OTI also contends there is an

8   adverse legal relationship between the parties because it alleges DDT's '191 patent is invalid based

9   on OTI's own earlier-filed patent application, which OTI claims is prior art to DDT's patent under

10  35 U.S.C. 102(e).

11       At the outset, the court dismisses OTI's argument with regards to its own U.S. patent

12  application being alleged as prior art to DDT's '191 patent, because it has no bearing on the

13  adjudication of the instant motion.  OTI's allegations about prior art and the validity of DDT's

14  patent go to the merits of the case and not OTI's standing to bring this suit.  To the extent that OTI

15  argues this is the only forum in which OTI can litigate such issues, OTI is mistaken.  OTI could seek

16  to intervene in the Texas suit or initiate its own suit in Texas if it has standing.  Further, because

17  OTI's patent application is still pending in the United States Patent & Trademark Office, it could

18  certainly attempt to provoke interference proceedings there.  Whether or not OTI's patent

19  application is prior art to DDT's '191 patent is not an issue for this court to consider further here.

20       In considering the other jurisdictional argument, the court reviews the alleged facts in the

21  light most favorable to OTI and the Supreme Court's recent revision of the declaratory judgment

22  jurisdiction standard to determine whether there is actual controversy between DDT and OTI within

23  the meaning of the DJ Act, 28 U.S.C. § 2201.

24       A.   Declaratory Judgment Jurisdiction Post-MedImmune

25       The Supreme Court's decision in MedImmune changed the landscape for declaratory

26  judgment jurisdiction in patent cases by overruling at least the first prong of a two-prong test; the

27  first prong being whether defendant's conduct creates "a reasonable apprehension that the defendant

28

6

1   will initiate suit if the plaintiff continues the allegedly infringing activity," and the second prong

2   being whether conduct by the plaintiff amounts to infringing activity or demonstrates concrete steps

3   taken with the intent to conduct such activity (e.g., "the plaintiff must actually have either produced

4   the device or have prepared to produce that device."). See, e.g., Arrowhead Indus. Water, Inc. v.

5   Ecolochem, Inc., 846 F.2d 731, 736 (Fed. Cir. 1988) (overruled at least in part by MedImmune).

6         In a post-MedImmune case, the Federal Circuit stated:

7         We need not define the outer boundaries of declaratory judgment jurisdiction, which
          will depend on the application of the principles of declaratory judgment jurisdiction

8         to the facts and circumstances of each case.  We hold only that where a patentee
          asserts rights under a patent based on certain identified ongoing or planned activity of

9         another party, and where that party contends that it has the right to engage in the
          accused activity without license, an Article III case or controversy will arise and the

10        party need not risk a suit for infringement by engaging in the identified activity
          before seeking a declaration of its legal rights.

11   SanDisk, 480 F.3d at 1381.

12        In this case, it appears OTI is trying to establish declaratory judgment jurisdiction under the

13   second prong, i.e., within the undefined "outer boundaries" to which the SanDisk court referred.

14   While several Federal Circuit decisions have acknowledged the rejection of the first prong of the

15   reasonable apprehension of suit test, the second prong in light of MedImmune has yet to be fully

16   considered.  See SanDisk, 480 F.3d at 1380 n.2 ("We . . . leave to another day the effect of

17   MedImmune, if any, on the second prong.").

18        As to this second prong, "the issue of whether there has been meaningful preparation to

19   conduct potentially infringing activity remains an important element in the totality of circumstances

20   which must be considered in determining whether a declaratory judgment is appropriate."  See Teva

21   Pharms., 482 F.3d at 1339 (a court must look at "all the circumstances" to determine whether a

22   justiciable Article III controversy exists).  If a declaratory judgment plaintiff has not taken

23   "significant, concrete steps to conduct infringing activity, the dispute is neither 'immediate' nor

24   'real' and the requirements for justiciability have not been met."  Cat Tech LLC v. Tubemaster, Inc.,

25   528 F.3d 871, 880 (Fed. Cir. 2008).

26        B.      Direct Infringement

27

28                                        7

1    OTI attempts to convince the court that DDT's suit in the Eastern District of Texas has

2  forced it to choose between abandoning a particular "business venture" or bringing matters to a head

3  by engaging in "arguably illegal activity." SanDisk, 480 F.3d at 1381.  This argument must fail

4  because OTI does not, itself, engage in such arguably infringing activity.  While a party need not

5  have engaged in the actual manufacture or sale of a potentially infringing product to obtain a

6  declaratory judgment of non-infringement, there must be a showing of "meaningful preparation" for

7  making or using that product, such as stockpiling equipment and preparing to distribute commercial

8  quantities of the produced goods.  Cat Tech, 528 F.3d at 881, citing Arrowhead, 846 F.2d at 736.

9    OTI explicitly states that it is a "fabless" chip company, which it defines as one that

10  fabricates nothing itself but contracts with manufacturing companies known as foundries to have its

11  chips produced.  These chips are then sold to OEMs that incorporate the chips into finished products.

12  OTI conducts no activity whatsoever in the United States; not selling, not making, not using, not

13  offering to sell, not importing anything subject to an infringement charge.  See 35 U.S.C. § 271(a).

14  Nor is there any evidence that OTI is gearing up to conduct any of those activities.  On these facts,

15  OTI's direct connection with the allegedly infringing end product that DDT accuses of infringement

16  is flimsy at best.

17    OTI further contends that DDT, along with three of the four defendants in the Texas suit,

18  purchases complete cables from the OEMs abroad and then resells them under various brand names.

19  Only one defendant in the Texas suit, Targus, apparently purchases the cables directly from OTI.

20  However, the language describing the contracting relationship between OTI and Targus brings into

21  question the purportedly "direct" nature of this relationship.  Despite the Targus statement that it

22  purchases the cables from OTI, OTI itself states that it does not manufacture any of these cables, or

23  even the chip inside the cables, and the aforementioned sale of cables to Targus is seemingly

24  through an importer/exporter based in Hong Kong.[1]  Thus, OTI seems to be, at best, coordinating

25  activities between various contractors (how many seems unclear) before U.S. retailers come on the

26  scene.

27

28

8

1    Based on this confusing and tenuous link to the finished cables—the allegedly infringing end

2    products—OTI is hoping to establish that it "meaningfully prepared" them.  Without any direct sales

3    into the United States, not to mention at least two other companies standing between it and the three

4    other named defendants in the Texas suit, OTI does not come close enough to meeting the

5    meaningful preparation standard so as to create a case or controversy necessary to establish

6    declaratory judgment jurisdiction on this basis.

7            B.      Indirect Infringement

8            OTI also argues its alleged indirect liability for patent infringement supports jurisdiction

9    here, based on DDT having accused OTI's customers of infringement for selling data transfer cables

10   that contain OTI's microchip.  OTI's only support for its contention that it should fall within these

11   indirect and "outer bounds" of declaratory judgment jurisdiction is Arrowhead, 846 F.2d at 739.

12   There, jurisdiction existed because Arrowhead was potentially an indirect inducer of infringement

13   and it indemnified its customer against liability as well.  Id.  OTI cites Arrowhead's discussion of

14   the second prong of the two-part test to argue that it could potentially be liable to DDT for

15   contributory or induced infringement for its role in "preparing to produce" the allegedly infringing

16   cables and also because it has indemnified its customers.

17           OTI's heavy reliance on this pre-MedImmune case is troublesome for several reasons.  The

18   biggest issue is that the declaratory plaintiff in Arrowhead was the manufacturer of the allegedly

19   infringing product, while here OTI does not even manufacture the chip.  Further, the chip is not even

20   the allegedly infringing product, but rather the cable, which is manufactured by a completely

21   different company for at least three of the four OTI customers and Texas defendants.  There is no

22   evidence in the record that OTI instructed the OEMs how to manufacture the complete data cable

23   products with all of the components required to induce the direct infringement of DDT's patent, or

24   that OTI actively encouraged or even sanctioned the downstream sale of the end products to U.S.

25   retailers.  These are game-changing facts.  See DSU Med. Corp. v. JMS Co., 471 F.3d 1293 (Fed.

26   Cir. 2006) (en banc) (liability for induced infringement requires evidence of active steps taken to

27   encourage direct infringement, such as advertising an infringing use or instructing how to engage in

28

United States District Court
For the Northern District of California

an infringing use, and mere knowledge of the allegedly infringing acts is not enough to establish

liability for inducing infringement). Because the issue of "meaningful preparation to conduct

potentially infringing activity" is such an important element in the totality of circumstances to be

considered in determining whether a declaratory judgment is appropriate, Cat Tech, 528 F.3d at 880,

OTI's jurisdictional basis is particularly precarious.

    The Federal Circuit decision in Microchip Tech. Inc. v. Chamberlain Group, Inc., 441 F.3d

936 (Fed. Cir. 2006), is instructive in helping to define the outer boundary of declaratory judgment

jurisdiction here. In Microchip, the declaratory defendant/patentee Chamberlain was a manufacturer

of garage door openers. Id. at 938. The patents-in-suit claimed a garage door opener that uses a

remote transmitter with a unique and permanent code and a receiver that can be placed into a

program mode. Id. Chamberlain had initiated lawsuits against various customers of Microchip, the

manufacturer of microprocessors that were incorporated into their garage door openers. Id. at 939.

Microchip then sought a declaratory judgment that the Chamberlain patents were invalid and

unenforceable and that Microchip's products did not infringe the patents. Id. The district court held

that an actual controversy under the DJ Act existed based on Microchip's "reasonable apprehension

that it cannot sell its allegedly non-infringing product without subjecting its customers, or itself, to

the threat of litigation for patent infringement." Id. at 940.

    On appeal, Chamberlain argued there was no actual controversy between it and Microchip

because it had never sued or threatened to sue Microchip of patent infringement in any of its prior

lawsuits in which Microchip and other manufacturers were involved. Id. at 940. Chamberlain

argued that a prior settlement agreement, which contained a covenant not to sue Microchip "or its

affiliates" on two of Chamberlain's patents "confirms that Microchip never possessed a reasonable

apprehension of suit." Id. Chamberlain further argued that Microchip had no adverse legal interest

in the action and that economic interest alone could not give rise to an "actual controversy." Id. at

941. Microchip parried that Chamberlain did not have to threaten it with a patent infringement suit

in order for the district court to possess declaratory judgment jurisdiction. Id. Instead, Microchip

argued that a manufacturer may bring a declaratory judgment action against a patentee in response to

1   the patentee's threats, or initiation of patent infringement litigation, *against the manufacturer's*

2   *customers*, relying on <u>Arrowhead</u>. <u>Id</u>. at 941 (emphasis added).  Microchip also argued the covenant

3   not to sue was "irrelevant" and did not provide "patent peace" because Chamberlain had not filed a

4   covenant not to sue Microchip's other ("actual or prospective") customers on the patents-in-suit.  <u>Id</u>.

5   at 941-42.

6          The Federal Circuit ruled that an actual controversy did not exist because Microchip did not

7   possess the requisite apprehension of itself being sued for infringement, albeit based on a pre-

8   <u>MedImmune</u> analysis of the first prong of the two-prong test.  <u>Id</u>. at 942.  The practical effect of

9   Microchip not being able to sell its product without subjecting its *customers*, and not itself, from the

10   threat of a patent infringement suit does not satisfy the prong.  <u>Id</u>.   It held that absent an "adverse

11   legal interest," this test cannot be met:

12          The concepts of 'adverse legal rights' and 'legal risk,' used in these cases to describe the
13          standard for jurisdiction require that there be an underlying legal cause of action that the
           declaratory defendant could have brought or threatened to bring, if not for the fact that the
           declaratory plaintiff has preempted it.

14   <u>Id</u>. at 943.

15          The Federal Circuit held there was no indication that Microchip had contributed to or

16   induced infringement by its customers, because there was no evidence that Microchip's technology

17   could not be used without infringing Chamberlain's patent or that Microchip had the required level

18   of intent to cause and encourage the alleged infringement.  Microchip did not itself manufacture the

19   allegedly infringing end product (in this case, garage door openers) and while Microsoft "may have

20   an interest in selling its [microprocessor] technology, such an interest does not inevitably lead to

21   Chamberlain's competitors being induced to practice Chamberlain's patented technology."  <u>Id</u>. at

22   944.  While Microchip's customers may themselves have had an adverse legal interest, they were not

23   parties to the action at bar.  <u>Id</u>.  The court also found that Microchip had not established a legal

24   relationship, like an indemnity agreement, between it and a customer that had a legal interest adverse

25   to Chamberlain.  <u>Id</u>.

26          At most, Microchip had only an economic interest in clarifying its customers' rights under
27          Chamberlain's patents, which may have facilitated the sale of Microchip's products.
           Microchip perhaps would economically have benefitted if its customers had no fear of suit by

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Chamberlain.  Such an economic interest alone, however, cannot form the basis of an 'actual controversy' under the Declaratory Judgment Act.

Id. at 943.

This pre-MedImmune holding informs this action because it addresses the same issue of whether jurisdiction existed based on allegations of direct infringement against a declaratory judgment plaintiff's customers absent evidence of indirect infringement by the declaratory judgment plaintiff.  Contrary to OTI's assertion, the lack of an underlying legal action in Microchip did not rest on the covenant not to sue between Microsoft and Chamberlain.  Rather, it rested on the same issues, or lack of issues, that arise here concerning whether OTI's microchip technology can be used without infringing DDT's patent, whether OTI caused or encouraged its customers' alleged acts of infringement, and to what extent OTI has a legal right to "clear the air" concerning its customers' use of its microchip.

Relevant to that inquiry, OTI also argues that an actual controversy exists between it and DDT because OTI indemnified the four Texas defendants.  As was the case in Microchip, the court has been provided with no agreement or other written document evidencing a legal basis for the defendants to have been indemnified by OTI, the designer of a microchip that is purportedly manufactured by foundries, incorporated into the final product by OEMs, and sold to retailers by the OEMs in most cases.  The court can do no more than assume, based on OTI's submissions of various declarations from the defendants in the Texas suit, that OTI approached the four Texas defendants and asked to be their indemnitor.  While the Federal Circuit held that an adverse legal interest could perhaps be created if Microchip had indemnified at least one of its customers that was allegedly infringing Chamberlain's patent, the lack of an indemnity agreement between OTI and its "customers" in the United States fails to carry any weight, let alone enough weight to create an adverse legal interest.  See Microchip, 441 F.3d at 944 ("Microchip has not produced any agreement indemnifying a customer against infringement of the patents-in-suit.  Thus, Microchip has no legal right to 'clear the air.'")

Even though satisfaction of the reasonable apprehension of suit first prong is no longer a necessary criterion for declaratory judgment jurisdiction, the court still holds the aforementioned

12

United States District Court

For the Northern District of California

1   portion of the Federal Circuit's <u>Microchip</u> analysis applicable to the declaratory judgment

2   requirements for justiciability articulated in <u>MedImmune</u>.   Because OTI's interest in indemnifying

3   these U.S. retailers, as best the court can discern, is to preserve its customer base, DDT is correct

4   that OTI's interest in this action is largely—if not exclusively—economic.  Based on the facts

5   alleged, under all of the circumstances, OTI has failed to show that there is "a substantial

6   controversy, between parties having adverse legal interests, of sufficient immediacy and reality to

7   warrant the issuance of a declaratory judgment." <u>MedImmune</u>, 549 U.S. at 127.

8          The court finds that OTI does not have standing to bring this action, based on a lack of an

9   underlying legal cause of action that DDT could have brought against OTI.[2]  Accordingly, the court

10  does not have jurisdiction to exercise any measure of discretion to hear the case or to address DDT's

11  motion in the alternate to transfer.  <u>See</u> <u>Wilton v. Seven Falls Co.</u>, 515 U.S. 277, 289 (1995) (district

12  courts retain some measure of discretion to decline to hear the case only when jurisdiction is

13  present).

14         Even if OTI's standing were deemed to reach the outer bounds of declaratory judgment

15  jurisdiction, the court would still find it appropriate to decline declaratory judgment jurisdiction here

16  because of the pendent DDT action in another jurisdiction.  The court takes DDT at its word when it

17  stated that it sued OTI's customers in Texas because those customers are currently the only known

18  direct infringers of the '191 patent.  Because any induced or contributory infringement requires a

19  finding of direct infringement, <u>see</u> 35 U.S.C. § 271(b) and (c), it is sensible, more appropriate, and

20  more convenient to address the allegations in the Texas suit first.  <u>See</u> <u>Golden Blount, Inc. v. Robert</u>

21  <u>H. Peterson Co.</u>, 365 F.3d 1054, 1061 (Fed. Cir. 2004) (in order to establish a claim of contributory

22  infringement, the plaintiff must show an act of direct infringement); <u>Micron</u>, 518 F.3d at 902-03

23  (outlining the convenience factors, including the absence of jurisdiction over all necessary or

24  desirable parties, used to assess jurisdiction that are the same as a transfer motion under 28 U.S.C.

25  section 1404(a)).

26

27  <u>CONCLUSION</u>

28
                                                 13

For the foregoing reasons, defendant's motion to dismiss is hereby GRANTED.

IT IS SO ORDERED.

Dated: July 27, 2009

MARILYN HALL PATEL
United States District Court Judge
Northern District of California

United States District Court

For the Northern District of California

14

**ENDNOTES**

1.  At the oral hearing on the matter, OTI attempted to assert that it directly sold complete cables to Targus in Orange County, California. The court then asked DDT whether this would make a difference for standing purposes, if OTI sells the completed device directly in the United States.   DDT acknowledged that it would.   The court then noted that OTI's oral assertion was in direct opposition to the assertions made in OTI's papers and supporting declarations.  See, e.g., Michelle Dec., Docket No. 17, ¶ 3 (declaring that Targus takes delivery of the cables in Hong Kong and imports them into the United States).  Indeed, later during the oral argument, OTI backtracked from its earlier statement and explained that OTI sells the cables to the U.S. company Targus, headquartered in Orange County, but that OTI does not actually sell to Targus directly in the United States.  This distinction is far from a semantic one and the court is not impressed with OTI's dissembling.

2. The court recognizes there are some instances in which a declaratory judgment plaintiff has standing even though the defendant could not have sued that plaintiff.  See, e.g., Maryland Cas. Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273 (1941).  This case is distinguishable, however, in that the defendant could have sued declaratory judgment plaintiff at some point in the future, namely, if the pending state case found liability against which the insured could claim from the declaratory judgment plaintiff, the insurer.  The Supreme Court held that the controversy was not eliminated simply because the state court had not ruled yet and might conclude there was no liability.   The insurer still had a right to sue the insured even though the collision-victim defendant could not have sued the declaratory-judgment plaintiff-insurer without first obtaining a judgment against the insured.   Here, it is not a temporal issue. There is no decision pending that will determine whether DDT can sue OTI in the future.

15